IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JANELLE GEDMIN,<br><br>             Plaintiff,<br>and<br><br>NORTH AMERICAN SAFETY PRODUCTS, INC.<br>             Defendant. | Case No.:<br>Judge:<br>Magistrate Judge:<br><br>JURY TRIAL DEMANDED<br><br>JUDGE ST. EVE<br>MAGISTRATE JUDGE MASON<br><br>08 C 337 |

**Complaint for Damages for Violations of 42 U.S.C. §2000e *et seq.* (Title VII)**

Plaintiff, Janelle Gedmin[1], by and through her attorneys, Karen J. Doran and Deanne S. Medina of DoranMedina, LLC, for her complaint against North American Safety Products, Inc. alleges and states as follows:

### INTRODUCTION

1. Janelle Gedmin, a woman, was employed by North American Safety Products, Inc. for approximately nine years until she was constructively discharged on February 27, 2006 after being subjected for approximately one year to sexual harassment (both *quid pro quo* and hostile work environment) and retaliation by the company president and general manager, Martin J. Mobek.

### PARTIES

2. Plaintiff is Janelle Gedmin ("Janelle"), a female citizen of the State of Illinois and resides within the territorial limits of the United States District Court for the Northern District of Illinois, Eastern Division.

3. At all times relevant to this complaint, Janelle was an "employee" of Defendant's as defined by 42 U.S.C. §2000e (f).

---

[1] Ms. Gedmin recently changed her name back to her maiden name from Wozniak. When she filed her charges with the Illinois Department of Human Rights, which was cross-filed with the Equal Employment Opportunity Commission, she was still using the name Janelle Wozniak.

4.	Defendant is North American Safety Products, Inc. ("NASP") and upon information and belief exists in and does business within the territorial limits of the United States District Court for the Northern District of Illinois, Eastern Division.

5.	At all times relevant to this complaint, Defendant was an "employer" as defined by 42 U.S.C. § 2000e (b).

### JURISDICTION

6.	Jurisdiction of this Court is founded upon 28 U.S.C. § 1331.

### VENUE

7.	Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as, on information and belief, Defendant is located in this District and the facts giving rise to this cause of action occurred in this District.

### FACTS

**Defendant Mobek, as president and general manager  
of Defendant NASP, sexually harassed Janelle**

8.	Mobek hired Janelle on September 16, 1998 as his administrative assistant, paying her a bi-weekly salary of $770.00.

9.	In or around October, 1999, she and Mobek went to New Orleans for a trade show.

10.	During that trip, Marty told her that he thought she was "hot" and that he wanted to take her to his hotel room. She immediately left him and returned alone to her room.

11.	When they arrived back in Illinois, after a very long, awkward, and quiet car ride, she gave him two-weeks notice of her intent to resign.

12.	He begged her to stay and offered her a $3.00 an hour raise, promising never to say those types of things to her again.

13.	Janelle took him at his word and rescinded her notice of resignation.

14.	In the years that followed, Janelle assumed greater and greater responsibilities and received several pay increases commensurate with her developing position.

15. By the fall of 2005, she was earning an annual salary of $76,748.00 along with various benefits, including complete medical coverage for her and her dependant son.

**Mobek goes back on his word.**

16. It was approximately at this time when Janelle began contemplating divorcing her husband.

17. Mobek became aware of Janelle's changing marital status and in or around March, 2005, approximately a month after she and her husband separated, he confessed to her that he was "madly in love" with her and had been for a long time.

18. Despite Janelle's unwavering rejection of his advances, Mobek continuously professed his love and attraction to her during their regular daily business meetings.

19. In addition to using these work meetings to express his feelings to her, Mobek sent her scores of emails and sentimental cards. He purchased her expensive jewelry and gift certificates to the lingerie store Victoria's Secret, and even told her parents about his feelings, apparently in the hope that they would sanction an affair between them!

20. Janelle consistently and continuously protested Mobek's advances, unambiguously explaining that she was not interested and that she did not think his advances were appropriate as he is 32 years her senior, her boss, and married.

21. Moreover, Mobek often hugged – or tried to hug – Janelle numerous times. On some occasions, he would come into her office, close her door and demand a hug. Many times he would kiss – or attempt to kiss – her. On a few of those occasions he managed to kiss her neck before she was able to pull away from him.

22. In addition to the unwelcome hugs and kisses, Mobek on several occasions slapped Janelle's buttocks. The last time he did that, she told him she would break his arm if he ever touched her there again.

23. During the summer of 2005, Mobek showed up at her son's sporting events where he took the opportunity to renew his romantic appeals to her.

24.     He would often drive out of the way late at night past her home, accusing her the next day of having sex[2] with her "boyfriends."

### Defendant cuts Janelle's pay by 36%.

25.     By September 18, 2005, Janelle could take no more. After receiving a series of messages from Mobek entreating her to join him on a weekend getaway to Florida – just the two of them so that she could get to know him on a personal level and perhaps change her mind about becoming involved with him – Janelle in no uncertain terms told him to stop coming on to her once and for all.

26.     On October 2, 2005, Marty informed Janelle that he was looking for her replacement and provided her with a bill from an Internet job posting web site.

27.     On the tenth of that month, Mobek sent Janelle an interoffice memorandum advising her that he was reducing her pay from an annual salary of $76,748.00 to an hourly rate of $28.00.

28.     At an average of 1,750 hours a year (35 hours per week, 50 weeks per year), this amounts to $49,000 – a 36% pay decrease.

### Janelle's boss continues to sexually harass her.

29.     On November 30, 2005, Mobek sent another memo to Janelle, this time directing her to undergo a "random" drug test or face possible termination.

30.     Janelle refused, explaining that she thought he was retaliating against her for refusing to accompany him on a weekend vacation as, upon information and belief, no other NASP employee has ever been asked to take a drug test.

31.     Prior to leaving on a business trip at around this time, Mobek left Janelle a gift-wrapped box on her desk – emerald earrings appraised at $2,500.00.

32.     Janelle was aghast at the inappropriate gift and promptly returned the earrings explaining that it was too expensive and symbolized a different sort of relationship than the employer/employee relationship they had.

---

[2]Mobek used another, profane word during these accusations.

33. Mobek was outraged and insulted. He gave the jewelry back to her with a note explaining that if she did not accept the gift, he would "take it to mean that you truly have a very deep hatred of me."

34. Understanding that to mean she must either accept the emeralds as a token of his affection for her or face continued deterioration of her relationship with her boss (likely culminating in her losing her job), Janelle kept the earrings.[3]

**Janelle complained of sexual harassment to NASP Chairman, Peter Andrews.**

35. Having felt the financial consequences of rejecting Mobek's advances and fearful of losing her job, Janelle informed Peter Andrews ("Andrews"), the Chairman of NASP, on or around December 30, 2005, that Mobek was sexually harassing her and retaliating against her.

36. Andrews, who lives in Los Angeles and does not work on site, told Janelle that he would talk to Mobek about the situation.

37. The following month, Mobek reinstated her previous rate of pay ($76,748.00 salary per year).

38. Upon information and belief, Andrews never investigated Janelle's complaints and he never even followed up with her concerning the sexual harassment or retaliation.

39. Upon further information and belief, Andrews never followed up with Mobek on this matter either.

40. At all times relevant to this complaint, Mobek was Janelle's supervisor and agent of NASP.

**Janelle is constructively discharged.**

41. Because her boss continuously sexually harassed her, even intruding on her personal life; drastically reduced her pay and directed her to take a drug test when she rejected his invitation to take a weekend trip with him; and threatened her with termination if she dared not keep the expensive jewelry he bought her, Janelle suffered severe emotional distress.

42. Consequently, she had frequent anxiety attacks that rendered her incapable of performing even the most simple tasks, including working.

---

[3]To this day, however, Janelle has never worn the "gift."

43.　　On Valentine's Day, 2006, Mobek gave Janelle a heart-shaped gold pendant. When she began to protest, Mobek told her "we're not going to go through this again," and so she did not refuse the necklace. Upon information and belief, Mobek did not give any other NASP employee a gift for Valentine's Day.

44.　　On Thursday, February 23, Janelle suffered several anxiety attacks, culminating in a debilitating episode during the afternoon of her work day.

45.　　After several unsuccessful attempts to rest it off, some co-workers called her mother, who came and picked her up.

46.　　Janelle rested the remainder of that day and the next, spending the night at her parents' house.

47.　　That Friday, Mobek called her and asked her to come into work to run a credit card through the machine. Janelle explained that she could not drive, but said that she would try to come in on Saturday.

48.　　The next day, just before she planned on going into work to run the card, Janelle suffered another panic attack and she called Mobek to tell him that she could not come in. Mobek angrily hung up on her.

49.　　Later that evening, her friend invited her out to see a band. Although she declined several times, Janelle's friend along with her mother, who opined that it would do her good, finally coaxed her into going.

50.　　On the following Monday, again just prior to returning to work, Janelle suffered another panic attack, so she could not go in until the afternoon.

51.　　After all of the other employees left at 5:00 p.m., Mobek asked her what she had done over the weekend. Janelle did not wish to discuss her personal life with her boss so she told him "nothing."

52.　　At that point Mobek became furious with her, telling her that he knew she had been out on Saturday night, and accused her of having sex with multiple men.

53.　　Janelle denied it, again not wanting to talk to Mobek about her personal life.

6

54. Mobek became incensed and accused Janelle of lying to him. He told her that he did not feel like he could trust her anymore and as such he was once again reducing her pay down to an hourly wage of $28.00.

55. Confused, angry, and frightened Janelle immediately left the building.

56. Mobek followed her to her car, screaming that he did not trust her and that she was a liar. As she was pulling out of her parking spot, Mobek smacked her driver's side window.

57. Later that evening Janelle, along with her father, returned to NASP while Mobek was still there.

58. She informed Mobek that she was quitting, gathered most of her personal belongings[4], and left with her dad.

59. Again, Mobek followed them into the parking lot, screaming through the car window that she was making a "mistake" and "would regret it."

**Count I:
Sex Discrimination
hostile work environment sexual harassment against
Defendant NASP**

60. Janelle realleges paragraphs 1 through 59 as paragraph 60 of this Complaint.

61. Defendant NASP discriminated against Janelle on the basis of her sex, female, when its president and general manager, Mobek, sexually harassed her by repeatedly making romantic overtures, sexual comments, and unwelcome sexual advances to her from in or around February, 2005 through her termination a year later on February 27, 2006.

**WHEREFORE**, Plaintiff Janelle Gedmin requests that this Court award her:

A. Back pay;

B. Front pay;

C. Compensatory Damages as determined by a jury;

D. Punitive Damages as determined by a jury;

E. Reasonable attorneys' fees, costs, and expenses of this action; and

---

[4]Plaintiff has since retrieved the remainder of her property, with the aid of her attorney.

F.     Such other relief as is just and appropriate and permitted by law.

### Count II:
### Sex Discrimination
### *quid pro quo* sexual harassment against
### Defendant NASP

62.     Janelle realleges paragraphs 1 through 59 as paragraph 62 of this Complaint.

63.     Defendant NASP discriminated against Janelle on the basis of her sex, female, when its president and general manager, Mobek, informed her on or around October 2, 2005 that he was looking for her replacement after she rejected his invitation less than two weeks before to take a weekend getaway with him.

64.     Defendant NASP discriminated against Janelle on the basis of her sex, female, when its president and general manager, Mobek, reduced her pay on or around October 12, 2005 after she rejected his invitation to take a weekend getaway with him.

65.     Defendant NASP also discriminated against Janelle on the basis of her sex, female, when its president, Mobek, threatened her with termination or other adverse act if she refused to accept his expensive gift to her of emerald earrings in December, 2005.

66.     Defendant NASP discriminated against Janelle on the basis of her sex, female, when its president, Mobek, reduced her pay[5] after she refused to discuss her personal life with him and he accused her of sleeping with other men.

**WHEREFORE**, Plaintiff Janelle Gedmin prays for:

A.     Back pay;

B.     Front pay;

C.     Compensatory Damages as determined by a jury;

D.     Punitive Damages as determined by a jury;

E.     Reasonable attorneys' fees, costs, and expenses of this action; and

F.     Such other relief as is just and appropriate and permitted by law.

---

[5] The last wages Janelle received from NASP were calculated at the lower rate, however on March 27, 2006, after she retained an attorney, Defendants rectified that underpayment by paying her the difference.

## Count III:
## Retaliation against Defendant NASP

67. Janelle realleges paragraphs 1 through 59 as paragraph 67 of this Complaint.

68. Defendant NASP retaliated against Janelle when its president and general manager, Mobek, informed her on or around October 2, 2005 that he was looking for her replacement after she accused him of sexual harassment less than two weeks before.

69. Defendant NASP retaliated against Janelle when its president and general manager, Mobek, reduced her pay on or around October 12, 2005 after she accused him of sexually harassing her less than a month before.

70. Defendant NASP retaliated against Janelle when its president and general manager, Mobek, directed her on November 30 to undergo a drug test after she accused him of sexually harassing her approximately two months before.

71. Defendant NASP retaliated against Janelle when its president, Mobek, reduced her pay less than two months after she complained to its Chairman, Andrews, that Mobek was sexually harassing her and retaliating against her.

**WHEREFORE**, Plaintiff Janelle Gedmin requests that this Court award her:

A. Back pay;

B. Front pay;

C. Compensatory Damages as determined by a jury;

D. Punitive Damages as determined by a jury;

E. Reasonable attorneys' fees, costs, and expenses of this action; and

F. Such other relief as is just and appropriate and permitted by law.

### TRIAL BY JURY DEMANDED

Respectfully submitted,
Janelle Gedmin,

By: s/Karen J. Doran
One of Her Attorneys

Karen J. Doran
Atty No. 6282773
Attorney for Plaintiff
DoranMedina, LLC
2625 Butterfield Road, Suite 138S
Oak Brook, IL 60523
Telephone: 630/368-0200
Fax: 630/368-0202
E-mail: kdoran@doranmedina.com

**Proof of Service**

Karen J. Doran, an attorney, certifies that she served this Complaint by mailing a copy of the same to Defense Counsel Thomas P. Polacek, McNamara, Phelan, McSteen, LLC, 116 N. Chicago St., Ste. 204, Joliet, IL 60432 from the post office box located at 2625 Butterfield Road in Oak Brook, Illinois, on January 15, 2008.

s/Karen J. Doran

Karen J. Doran
Atty No. 6282773
Attorney for Plaintiff
DoranMedina, LLC
2625 Butterfield Road, Suite 138S
Oak Brook, IL 60523
Telephone: 630/368-0200
Fax: 630/368-0202
E-mail: kdoran@doranmedina.com